IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| JAMES CASTLE COLLECTION AND ARCHIVE, LP, | Case No. 1:17-CV-437-BLW |
|---|---|
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| SCHOLASTIC, INC.; and ALLEN SAY, an individual, | |
| Defendants. | |

# INTRODUCTION

The Court has before it a motion for temporary restraining order. The Court held oral argument on October 30, 2017, and took the motion under advisement. For the reasons set forth below, the Court will deny the motion.

# FACTS

Plaintiff Castle Collection seeks to enjoin the distribution and sale of the children's book, "Silent Days, Silent Dreams" (the "Book"). The Book is written and illustrated by Allen Say and published by Arthur A. Levine, an imprint of Scholastic. It is scheduled for release to the public tomorrow (October 31, 2017).

The Book by its author as an "imagined biography" of the artist James Castle. *Exhibit C Part 2 (Dkt. No; 7-6).* Born in rural Idaho in 1899, Castle was deaf from birth and never learned to communicate orally or in writing. He became a prolific artist, widely recognized for creating works with found materials such as discarded papers and

**Memorandum Decision & Order – page 1**

food containers. His work is now found in museums, art galleries, and private collections all over the world.

The Book, written for children from the perspective of Castle's fictional nephew, includes approximately 150 illustrations, all drawn by Say. About 28 of those illustrations are Say's copies of Castle's art, while the other illustrations are Say's own depictions of various events in Castle's life, drawn in a style similar to that of Castle. In the Author's Note, Say explains that he tried to "mimic" and "emulate [Castle's] unschooled style" by "us[ing] the same kinds of odd materials [Castle] had used . . . ." *Exhibit C Part 2 (Dkt. No; 7-6)*. Say drew with a bamboo pen on a used shopping bag "as James might have done;" he used burnt matchsticks and sharpened sticks "dipp[ed] in soot mixed with spit;" and he "drew on ninety-year-old letters and envelopes." *Id.* Reviewers have noted the similarity between Castle's works and Say's illustrations. *See Crist Declaration (Dkt. No. 7-2) at ¶ 29.* These illustrations, along with text, describe a chronological narrative of the artist's life.

Plaintiff Castle Collection alleges that it is the exclusive owner of all copyrights to the works that it alleges are infringed by the Book. *See Amended Complaint (Dkt. No. 14) at ¶ 4.* The Castle Collection has not authorized defendants Say or Scholastic to use any of its copyrighted works, nor has the Castle Collection been involved in any way in the creation of the book. *Id.* The Book contains 28 illustrations that are unauthorized infringing copies of Castle's artistic works, according to the Amended Complaint. *Id.*

The Book has been distributed to book sellers and is due to go on sale tomorrow (October 31, 2017). The Castle Collection asks the Court to enjoin the sales and distribution of the Book.

## ANALYSIS

### Temporary Restraining Order

To obtain a temporary restraining order, the Castle Collection must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 24 (2008).

In this case, the Book has already been distributed to many book sellers, and Castle Collection asks the Court to order that defendants take affirmative steps to contact those book sellers to halt sales of the Book. This relief is treated as a mandatory injunction because "it orders a responsible party to take action." *Garcia v. Google,* 786 F.3d 733, 740 (9th Cir. 2015). A mandatory injunction "goes well beyond simply maintaining the status quo pendente lite and is particularly disfavored." *Id.* The "district court should deny such relief unless the facts and law clearly favor the moving party." *Id.* In plain terms, mandatory injunctions should not issue in "doubtful cases." *Id.*

### Fair Use

The Copyright Act exists to stimulate artistic creativity for the general public good. *SOFA Entertainment Inc. v. Dodger Productions Inc.,* 709 F.3d 1273, 1277 (9th Cir. 2013). It does so by granting authors a "special reward" in the form of a limited monopoly over their works. *Id.* However, "an overzealous monopolist can use his

**Memorandum Decision & Order – page 3**

copyright to stamp out the very creativity that the Act seeks to ignite." *Stewart v. Abend*, 495 U.S. 207, 236 (1990). To avoid that perverse result, Congress codified the doctrine of fair use in 17 U.S.C. § 107: "[T]he fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research [ ] is not an infringement of copyright." The statute lists four factors to guide courts in their analysis: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. The Court will consider each.

**The Purpose and Character of the Use**

The central inquiry under the first factor is whether the new work is "transformative." *SOFA,* 709 F.3d at 1278. Transformative works "add something new" to an existing work, endowing it with "new expression, meaning, or message," rather than "merely superseding the objects of the original creation." *Id.*

In *SOFA*, the Ninth Circuit held that the use of a copyrighted clip from the Ed Sullivan Show in the fictional musical Jersey Boys documenting the career of the band the Four Seasons was transformative because it served "as a biographical anchor" marking "a significant moment in the band's career" and was not simply used for its own entertainment value. *Id.* Similarly, in *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir.2006), the Second Circuit held that the use of Grateful Dead concert posters in a book was transformative because they were used as "historical

**Memorandum Decision & Order – page 4**

artifacts" to "enhance the reader's understanding of the biographical text," and were combined with "a prominent timeline, textual material, and original graphical artwork, to create a collage of text and images on each page of the book." *Id.* at 609.

Akin to the works in *SOFA* and *Graham,* the Book in this case is transformative. The Book is an attempt by Say to "see the young [Castle's] silent world through his eyes." *See Exhibit C Part 2 (Dkt. No; 7-6).* The Book mainly draws on facts but also includes speculation based on reasonable inferences from facts (he was bullied by classmates for being deaf and mute) or just pure speculation (he was slapped by his father and locked in an attic by his parents). *See Christ Declaration (Dkt. No. 7-2) at ¶ 72.* In essence, Say created a version of Castle as a self-taught artist who was isolated by his disabilities and driven by his artistic passion, ultimately finding salvation in his art from a harsh world. That version of Castle emerges from Say's illustrations themselves and their placement at various points in the chronological text. In other words, the illustrations combine with the text to create Say's version of Castle.

In this sense, the illustrations transform Castle's art into a version of Castle's life story, a version created by author and illustrator Say. Because Say's use of Castle's art is transformative, the fact that the Book is a commercial production "is of little significance." *Id.* at 1279.

While the Court is not making any final rulings in this TRO proceeding, the Court finds it likely that this first factor weighs heavily in defendants' favor.

## The Nature of the Copyrighted Work

This second factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Id.* at 586. Certainly, Castle's art works are original, placing them within the core of intended copyright protection. The second factor likely favors the Castle Collection. But in cases of transformative use, the nature of the work carries less significance. *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 (9th Cir.2003).

## Amount & Substantiality

The third fair use factor looks to "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." *See* 17 U.S.C. § 107(3). Here, the Castle Collection identifies 28 illustrations that it claims are infringing, out of the 150 illustrations in the Book. "This factor calls for thought not only about the quantity of the materials used, but about their quality and importance, too." *Campbell*, 510 U.S. at 587. Moreover, the copying of a substantial portion of the original work "may reveal a dearth of transformative character or purpose under the first factor." *Campbell*, 510 U.S. at 587.

Here, the copying was necessary to enhance the biographical narrative, told largely through Say's own illustrations that were not exact copies, but mimicked Castle's style. This process became literally transformative in instances where a Castle rendering was changed by inserting Castle himself or other characters into the drawing. This factor weighs in favor of Say and Scholastic.

**Potential Market**

The fourth fair use factor examines "the effect of the use upon the potential market for or value of the copyrighted work." This factor likely weighs in defendant's favor because the Castle Collection dislikes the way Castle is portrayed in the Book and would not have licensed his art for that use. *See Amended Complaint (Dkt. No. 14)* at ¶¶ 30-31. In those circumstances, this fourth factor favors defendants. *Campbell,* 510 U.S. at 592.

**Conclusion**

Weighing the four factors, the Court finds, at this early juncture in the case, that three of them likely favor defendants, while the one that favors the Castle Collection is of little significance. Because, the defendants are likely to prevail on their fair use defense, the Court cannot find that the Castle Collection is likely to prevail on the merits. Moreover, the Castle Collection is seeking a mandatory injunction, a form of relief that is "particularly disfavored" and available only if "the facts and law clearly favor the moving party." *Garcia,* 786 F.3d at 740. That is not the case here. When "a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three *Winter* elements." *Id.* Consequently, the motion for temporary restraining order will be denied.

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the expedited motion for temporary restraining order (docket no. 7) is DENIED.

 DATED: October 30, 2017

_____
B. Lynn Winmill
Chief Judge
United States District Court